DECISION
{¶ 1} Relator, John W. Baker, filed this original action asking this court to issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying relator permanent total disability ("PTD") compensation, and to enter an order granting such compensation.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this court referred this matter to a magistrate of the court. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court grant the requested writ. (Attached as Appendix A.)
 {¶ 3} In brief, the commission denied relator's application for PTD compensation for an industrial injury to his right foot, right hand, and right wrist. The record contains multiple medical and vocational reports. The commission relied on the medical reports of Drs. James T. Lutz and Donald L. Brown, and the vocational report of Ms. Lynne Kaufman to conclude that relator is capable of sustained remunerative employment. In his report, Dr. Lutz noted certain limitations regarding relator's use of his right hand, assessed impairments for injuries to the right hand, wrist, and upper extremity, and assessed a 48 percent whole person impairment. Nevertheless, Dr. Lutz concluded that relator is capable of "sedentary work." In her vocational report, Ms. Kaufman identified medical opinions relevant to relator's residual functional capacities and listed "Dr. James Lutz; sedentary work." The magistrate found the Kaufman vocational report "suspect" because, in his view, it is unclear whether Kaufman vocationally evaluated relator's right upper extremity impairment or considered only exertional strength. The magistrate also noted that Ohio Adm. Code 4121-3-34(B)(2)(a), which defines "sedentary work," considers only exertional force abilities and does not account for the type of fine manipulation or grip strength impairments that may apply to relator. On these grounds, the magistrate recommended that this court order the commission to vacate its order denying relator's PTD application and to issue a new order adjudicating the application.
 {¶ 4} The commission and respondent, Formica Corporation ("employer"), filed objections to the magistrate's decision. They assert that the magistrate erred by finding the Kaufman report "suspect" and the commission's reliance on that report "flawed." We agree.
 {¶ 5} In order to successfully challenge the commission's order, relator must demonstrate an abuse of discretion. State ex rel.Consolidation Coal Co. v. Indus. Comm. (1997), 78 Ohio St.3d 176, 177. The commission does not abuse its discretion if "some evidence" supports its order. Id. Here, we agree with respondents that "some evidence" supports the commission's order. While the record does contain contrary evidence, the medical reports of Drs. Lutz and Brown, and the vocational report of Ms. Kaufman, all support the commission's finding that relator is capable of sustained remunerative employment. Most important here, Dr. Lutz concluded that relator was capable of "sedentary work," albeit within certain restrictions. Dr. Lutz having made that conclusion, it was not improper for Ms. Kaufman to note "Dr. James Lutz; sedentary work" in her report or for the commission to rely on her report.
 {¶ 6} The fact that Ms. Kaufman did not expressly describe the restrictions identified in Dr. Lutz's report does not support a different result on mandamus. For this court to go further than finding "some evidence" and to "assess the credibility of the evidence would place this court `in the role of a "super commission," a role never envisioned by either the Ohio Constitution or the General Assembly.'" Id. at 177, quoting State ex rel. Burley v. Coil Packing, Inc. (1987),31 Ohio St.3d 18, 20. "The commission, not this court, is the exclusive evaluator of the weight and credibility of the evidence." State ex rel.Pence v. Indus. Comm., Franklin App. No. 04AP-124, 2004-Ohio-7052, at ¶ 7, citing State ex rel. LTV Steel Co. v. Indus. Comm. (2000),88 Ohio St.3d 284, 287.
 {¶ 7} It is well-established that the commission is also the exclusive evaluator of non-medical factors. State ex rel. Jackson v. Indus. Comm.
(1997), 79 Ohio St.3d 266, 270. As such, the commission has broad discretion to evaluate and interpret evidence assessing a claimant's vocational potential and, in exercising that discretion, may reject any or all vocational reports. State ex rel. Ewart v. Indus. Comm. (1996),76 Ohio St.3d 139. As applied here, the commission could have rejected the Kaufman report altogether. If it had done so, it could have relied on the Lutz report directly and still determined — as Dr. Lutz determined — that relator is capable of sedentary work.
 {¶ 8} For these reasons, and based on our independent review of the evidence in this matter, we sustain the commission's objection and the employer's second objection to the magistrate's decision, we conclude that we need not reach the employer's first objection, and we deny the requested writ of mandamus.
Objections sustained, writ of mandamus denied.
Klatt and McGrath, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. John W. Baker, :
 Relator, :
v. : No. 05AP-137
Formica Corp. and The Industrial : (REGULAR CALENDAR)
Commission of Ohio, :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on July 26, 2005 Clements, Mahin Cohen, LPA, Co., and Catharin R. Taylor, for relator.
Dinsmore Shohl LLP, and Joan M. Verchot, for respondent Formica Corporation.
Jim Petro, Attorney General, and Sue A. Zollinger, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 9} In this original action, relator, John W. Baker, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 10} 1. On April 29, 1999, relator sustained an industrial injury while employed as a quality control supervisor for respondent Formica Corp. ("employer"), a self-insured employer under Ohio's workers' compensation laws. On that date, relator sustained crush injuries to his right foot when a toe motor ran over it. He also sustained injures to his right hand and wrist. The industrial claim, assigned claim number 99-417255, is allowed for:
OPEN FRACTURE, RIGHT THIRD METACARPAL; RIGHT WRIST FRACTURE; MULTIPLE FRACTURES OF TOES, RIGHT; RIGHT HAND LACERATION; LUMBAR STRAIN; REFLEX SYMPATHETIC DYSTROPHY, RIGHT FOOT; ADJUSTMENT DISORDER WITH ANXIETY AND DEPRESSED MOOD; AMPUTATION RIGHT FIRST, SECOND, THIRD, FOURTH AND FIFTH TOES; RIGHT FRACTURE METACARPAL BONE, FRACTURE RIGHT CARPAL BONE, OPEN WOUND RIGHT HAND.
 {¶ 11} 2. On November 12, 2003, relator filed an application for PTD compensation. In support, relator submitted a report, dated November 3, 2003, from his treating physician Robert A. Raines, Jr., M.D., stating:
* * * [Relator] does not have any significant use of his right foot or ankle. All of these problems are [a] direct result of his work related injury in 1999 and his impairments are permanent. He continues to have pain, difficulty of walking and is in need of medication. It is my opinion that based on his many years of training, his age, constant pain and significant limp that he is totally disabled from his injury and I do not see any significant improvement likely in the future.
 {¶ 12} 3. In further support of the PTD application, relator submitted a report, dated August 22, 2002, from neurologist Arthur L. Hughes, M.D., stating:
My understanding of the definition of "loss of use" is that it must be equivalent in loss of function to that which would occur if the part were amputated. Mr. Baker has had amputation of all of the toes. The toes are important in proper motion of the foot with walking and are important for balance. He has less than 5 degrees range of motion of flexion and extension of the ankle and 0 degrees of inversion and eversion so that his foot no longer can function independently of his leg. The foot is now functioning basically as a support surface and not as a functioning unit assisting in ambulation. Based on this analysis, Mr. Baker's residual foot function could be replaced by a prosthesis. In my opinion, he therefore meets the criterion for "loss of use."
* * * In my opinion, Mr. Baker is permanently disabled as a result of his right foot, right hand and lower back injuries. However, it is possible that he could perform some sedentary task, which would involve minimal use of the upper extremities and would not necessitate him walking or standing. In this sense, the disability, although severe, is not total.
 {¶ 13} 4. On December 23, 2003, relator was examined at the employer's request by Paul T. Hogya, M.D., who wrote:
History: Mr. John Baker states that he was employed as a Supervisor in the Treating Department at the Formica Corporation. On the date of injury, 4/29/1999, he was exiting an office when a tow-motor operator ran over his right foot while the tow motor had 3000 pounds of material on it. He sustained a crush injury to the right foot and was also apparently stuck [sic] on the right hand, sustaining a laceration across the dorsum. * * *
* * *
With respect to the right wrist and hand, he states he underwent simple laceration repair and a short course of splinting. He performed home exercises, primarily squeezing a rubber ball. He did not require any surgical fixation or closed reduction to the hand fracture. He had no subsequent supportive treatment.
* * *
Current Symptoms: The claimant states that he has some stiffness to the right hand and wrist, particularly when he attempts to make a fist. He finds it difficult to write on any sustained basis. He has some difficulty with fine manipulation, such as picking up small objects and coins. There is no referred numbness. He notes occasional swelling and cramping of the digits. * * *
* * *
In my medical opinion, the medical evidence and direct physical examination findings do support that Mr. Baker is capable of sustained remunerative employment with regard to these allowed conditions. He is capable of sedentary work activities. This would include exerting up to ten pounds of force occasionally and/or negligible amounts of force frequently in the course of lifting, carrying, pushing or pulling various objects. He would be capable of walking or standing for brief periods of time scattered through the day.
* * *
* * * [H]e would be on sedentary work restrictions. The lifting, carrying, pushing or pulling would be restricted to above knee level. He would be capable of entering and exiting a work place using stairs or a handicap access ramp. Standing and walking should be limited to 20 minutes at a time with no more than every three hours. If he is required to stand at a work station, there should be appropriate rubber padding. He has no specific restrictions with regard to use of the right hand as it relates to the allowed conditions in the claim.
* * *
With respect to the right hand and wrist, he had a simple transverse laceration across the dorsum of the hand that was repaired primarily without complication. There were nondisplaced fractures to the right metacarpal and carpal bone, which were treated conservatively with simple splinting followed by home exercises. The minor examination abnormalities noted above cannot be directly attributable to these simple allowed conditions. Therefore, the claimant has a 0% impairment with regard to this region.
 {¶ 14} 5. On January 23, 2004, relator was examined at the commission's request by James T. Lutz, M.D., who is board certified in occupational medicine. In his narrative report, Dr. Lutz wrote:
CHIEF COMPLAINTS: Right foot pain and right wrist pain.
HISTORY OF PRESENT ILLNESS: * * * His current symptoms include intermittent, but daily pain of the right wrist and hand, without radiation of pain. He describes constant numbness over the dorsum of the right hand. He also describes loss of use and strength of the hand and notes that he is unable to appose the thumb to the small or ring fingers. He also describes lack of fine manipulation. His symptoms are aggravated with gripping activities, any repetitive use of the right upper extremity, and with weather changes. * * *
* * *
PHYSICAL EXAMINATION: * * * Examination of the right wrist and hand revealed a large U-shaped scar over the dorsum of the hand, running from the webspace between the thumb and index finger to the MP joint of the small finger. Mild tenderness was noted over the middorsal region of the hand and wrist. Decreased sensation was noted over much of the dorsum of the hand. The claimant was able to make only a partial fist, but did have full extension of all digits of the hand. No atrophy of the hand was noted, and gross sensation of the fingers appeared intact measuring 6.0-millimeters at the tips of all digits of the right hand. Range of motion studies of the right wrist were as follows: Flexion 55 degrees, extension 35 degrees, radial deviation 20 degrees, and ulnar deviation 30 degrees. Grip strength measured 36-kilograms on the left and 26-kilograms on the right. * * *
* * *
* * * Reference is made to the Fourth Edition of the AMA Guides Revised in arriving at the following impairment assessment. For injuries to the right hand including open fracture right third metacarpal, right hand laceration, right fracture metacarpal bone, and open wound right hand: I will allow a 2% whole person impairment for the claimant's ongoing pain. For injuries to the right wrist including right wrist fracture and fracture right carpal bone. For range of motion, utilizing figures 26 and 29 the claimant warrants a 6% upper extremity impairment. For neurosensory and neuromotor the claimant warrants a 0% impairment. For specific disorders with loss of grip strength, utilizing table 34 the claimant warrants a 10% upper extremity impairment. For lack of opposition, utilizing table 7 on page 29 the claimant warrants a 9% digit impairment, which utilizing table 1 on page 18 corresponds to a 4% hand impairment, which utilizing table 2 on page 19 corresponds to a 4% upper extremity impairment. Combining 10+6+4 the claimant warrants an 18% whole person impairment, which utilizing table 3 on page 20 corresponds to an 11% whole person impairment. For lumbar strain: Utilizing table 72 on page 110 the claimant warrants a DRE category II, which equals a 5% whole person impairment. For injuries to the right foot including amputation first, second, third, fourth and fifth toes; and multiple fractures of toes requiring the routine use of a cane and AFO brace: The claimant's best impairment assessment is made utilizing table 36 on page 76, for which he warrants a 30% whole person impairment. For reflex sympathetic dystrophy right foot: I will allow a 10% whole person impairment. Combining 30+11+10+5+2 the claimant warrants a 48% whole person impairment.
 {¶ 15} 6. On January 23, 2004, Dr. Lutz completed a physical strength rating form. On the form, Dr. Lutz indicated by checkmark that relator "is capable of physical work activity as indicated below." (Emphasis omitted.) Underneath, by checkmark, Dr. Lutz selected "sedentary work."
 {¶ 16} 7. On January 27, 2004, relator was examined at the commission's request by psychiatrist Donald L. Brown, M.D. In his narrative report, Dr. Brown wrote:
In my opinion, Mr. Baker has reached MMI with respect to his previously allowed adjustment disorder with anxiety and depressed mood and it can be considered permanent. Utilizing the Fourth Edition of the AMA Guides Termination of Permanent Impairment, I'd rate him as having a Class II level of impairment. This is a mild level impairment. Referencing the percentages from the Second Edition in the Fourth Edition, I would rate his impairment at 15-20%.
 {¶ 17} 8. Dr. Brown also completed an occupational activity assessment form. On the form, Dr. Brown indicated by checkmark that the psychiatric impairment permits relator to both return to his former position of employment and perform any sustained remunerative employment.
 {¶ 18} 9. The commission requested an employability assessment report from Lynne Kaufman, a vocational expert. The Kaufman report, dated March 5, 2004, responds to the following query:
Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed condition(s), identify occupations which the claimant may reasonably be expected to perform, immediately and/or following appropriate academic remediation.
 {¶ 19} In response to the above query, Kaufman listed six physicians of record and briefly described the "residual functional capacity" as found by that physician. Kaufman then listed "employment options" where appropriate.
 {¶ 20} First among the six physicians listed is Dr. Lutz. Kaufman wrote:
[One] Dr. James Lutz; sedentary work.
[One] Sedentary: appointment clerk, scheduler, routing clerk, order clerk, information clerk, repair order clerk, service clerk.
Third among the six listed is Dr. Brown. Kaufman wrote:
[Three] Dr. Donald Brown, Psychiatrist; able to return to former position and other sustained remunerative employment.
[Three] Psychiatrically able to return to former work and jobs in #1.
The fifth among the six listed is Dr. Hughes. Kaufman wrote:
[Five] Dr. Arthur Hughes; could perform some sedentary tasks with minimal use of upper extremities and no walking or standing.
[Five] No work.
 {¶ 21} Under "Effects of Other Employability Factors," Kaufman wrote:
[One] Question: How, if at all, do the claimant's age, education, work history or other factors (physical, psychological and sociological) effect his/her ability to meet basic demands of entry level occupations?
Answer: Age: Would be expected to have some difficulty adapting to some entry level work but not all.
Education: Limited education with the injured worker reporting he can read but cannot write or do basic math well. May be limited to entry level jobs not requiring much writing or math. It is noted the injured worker reports completing schedules, production reports and using a computer in his past work. He did do some home based computer work.
Work History: The injured worker reports work in one occupation for about 39 years. It appears that his skills are occupationally specific and generally not transferable.
* * *
[Two] Question: Does your review of background data indicate whether the claimant may reasonably develop academic or other skills required to perform entry level Sedentary or Light jobs?
Answer: Academic and skill remediation are not precluded but benefit may be reduced by the psychological condition.
 {¶ 22} 11. Under "Employability Assessment Database," Kaufman wrote:
 B. WORK HISTORY:
 JOB * * * SKILL STRENGTH DATES
 TITLE LEVEL LEVEL
 Quality * * * Skilled Light 9/62 —
 Control 1/4/01
 Supervisor
 C. EDUCATIONAL HISTORY:
 Highest Grade Completed: 10th
 Date of last attendance: 1960
 H.S. Graduate: No
 GED: No
 Vocational training: No
 ICO Education Classification: Limited Education
 * * *
 E. ADJUSTED WORKERS TRAIT PROFILE:
 General Educational Development: (GED)
 Grade Level USDOL Level
 (R) Reasoning High School 4
 (M) Math 7th to 8th 3
 (L) Language 7th to 8th 3
 {¶ 23} 12. In further support of his PTD application, relator submitted a vocational report from William T. Cody dated April 2, 2004. The Cody report states:
Mr. Baker has work experience in a job performed at the light level of physical demand. He has no experience in or skills that transfer to positions performed at the sedentary level of physical demand. Therefore, only unskilled sedentary jobs can be considered as appropriate for Mr. Baker, according to the limitations provided by Dr. Lutz. His limited, tenth grade, education supports the proposition that he cannot perform semiskilled work within his physical capacity, especially clerically based work activity. He only used a computer on a superficial level in his past work activity. He did not acquire skills that would support his ability to work in a job that requires the use of a computer. Formica's inability to accommodate his restrictions is evidence that he does not have office skills.
Dr. Hughes cautions that any work Mr. Baker may be able to perform can only "involve minimal use of the upper extremities" (emphasis added). This additional restriction precludes the unskilled sedentary work that could otherwise be considered as appropriate for Mr. Baker as all unskilled sedentary work involves more than minimal use of one's upper extremities. Dr. Lutz does not specifically mention limitations Mr. Baker has in relation to his right, dominant, upper extremity, but he does consider his loss of "grip strength" (emphasis added) and his "lack ofopposition" (emphasis added) in his calculation of Mr. Baker's whole body impairment. Dr. Hogya indicates that Mr. Baker "finds it difficult towrite on any sustained basis" (emphasis added) because of the allowed injury he suffered to his right hand.
If the faulty assumption is made that there are jobs that fit within the limitations offered by Dr. Lutz, Dr. Hughes, and Dr. Hogya, Mr. Baker's ability to adapt to a new kind of job given his relevant vocational factors must be considered. He is sixty years of age and has significant limitations including a reduced ability to use his dominant hand, as commented upon by Dr. Lutz and Dr. Raines, Dr. Hogya, and Dr. Hughes, a work history he is not able to physically perform, and a limited, tenth grade, education. Under these circumstances, he could not be expected to adequately adapt to the new tools, tasks, procedures, and rules involved in performing a new type of work activity, a type of work that he has not performed in the past. This holds true even for unskilled work. The Industrial Commission defines the age of sixty years as closely approaching advanced age. Being of this age presents it own obstacles in terms of adjusting to a new kind of work activity. When combined with significant physical impairments, a work history in a job he can no longer perform, a reduced ability to use his dominant hand, and a limited education, being of this age clearly serves as a contributing factor to an inability to make vocational adjustments.
Therefore, in the opinion of this vocational expert, John Baker is permanently and totally occupationally disabled. That is, there are no jobs in the local or national economies that he is able to perform. This conclusion was reached considering his closely approaching advanced age, limited education, work history, and the physical limitations that he has as a result of his allowed injury, claim number 99-417255.
Vocational experts may identify unskilled sedentary jobs (sedentary assembler, sedentary inspector, sedentary cashier, security system monitor, information clerk, and other unskilled clerical jobs) as well as semiskilled sedentary positions as appropriate for Mr. Baker when the limitations offered by Dr. Lutz are solely considered. That is, if they are considered without taking the relevant vocational factors into account. If the comprehensive impact of all the relevant vocational factors is appropriately considered, as highlighted above, Mr. Baker must be found to be permanently and totally disabled.
(Emphasis sic.)
 {¶ 24} 13. Following a June 1, 2004 hearing, a staff hearing officer ("SHO") issued an order denying the PTD application. The SHO's order states:
The injured worker was examined by Dr. Lutz at the request of the Industrial Commission with respect to the allowed orthopedic conditions in the claim. Dr. Lutz opined that the injured worker has reached maximum medical improvement considering the allowed conditions and has a resulting 48% whole person permanent impairment. Dr. Lutz completed a Physical Strength Rating form which he attached to his medical report wherein he indicated that the injured worker is capable of physical work activity at a sedentary level. Sedentary work is defined on that form as meaning the ability to exert up to ten pounds of force occasionally and a negligible amount of force frequently. It further involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are considered sedentary if walking and standing are required only occasionally and all sedentary criteria are met.
The injured worker was evaluated by Dr. Brown at the request of the Industrial Commission with respect to the allowed psychological conditions in the claim. Dr. Brown opined that the injured worker has reached maximum medical improvement considering the allowed psychological conditions and has a resulting class II level of impairment, which he characterized as a mild level of impairment. Dr. Brown rated this impairment at 15 to 20 percent to the whole person. Dr. Brown opined that the allowed psychological conditions have stabilized and are in remission. He further opined that those conditions would not prevent the injured worker from returning to his former position of employment or other forms of sustained remunerative employment. Dr. Brown opined that the allowed psychological conditions would cause a mild impairment in activities of daily living, socialization, adaptation, and concentration, persistence and pace.
The Staff Hearing Officer finds that the injured worker is capable of performing sedentary employment based on the medical report of Dr. Lutz and in accordance with its definition on the Physical Strength Rating form. The Staff Hearing Officer further finds that the injured worker is not prevented from performing any form of gainful employment considering the allowed psychological conditions, based on the medical opinion of Dr. Brown.
An employability assessment of the injured worker was performed by Ms. Kaufman at the request of the Industrial Commission. Ms. Kaufman opined that considering the residual functional capacities as expressed by Dr. Lutz and Dr. Brown, the injured worker has the following employment options: appointment clerk, scheduler, routing clerk, order clerk, information clerk, repair order clerk, and service clerk. Ms. Kaufman noted the injured worker's age of 59 and stated that he is categorized as a person of middle age. Ms. Kaufman opined that such age would present some difficulty in adapting to some entry level work, "but not all". She further noted that the injured worker has a limited 10th grade education. Ms. Kaufman recited that the injured worker reported on his application for Permanent and Total Disability compensation that he is able to read, but cannot write or perform basic mathematics well. Ms. Kaufman opined that such academic limitations would qualify the injured worker to perform entry level jobs not requiring much writing or mathematics. She noted, however, that the injured worker reported that he completed schedules, production reports and used a computer in his past work. Ms. Kaufman further reviewed the injured worker's work history which consisted of performing one occupation for approximately 39 years. Ms. Kaufman opined that the skills obtained in such occupation are specific and generally not transferable.
The Staff Hearing Officer finds that the injured worker is 59 years old, has a 9th or 10th grade formal education, and work experience as a quality control supervisor. The Staff Hearing Officer finds that the injured worker's age is a limitation in that it may cause some difficulty in adapting to unfamiliar work settings. However, the Staff Hearing Officer finds that the injured worker's age is not a barrier which would prevent him from performing all entry level occupations. The Staff Hearing Officer finds that at such age, the injured worker would best be suited to acquire new skills through on-the-job training. The Staff Hearing Officer further finds that the injured worker's limited education is a factor which would present a barrier in performing occupations requiring proficiency in writing or mathematics. However, the Staff Hearing Officer finds that the injured worker performed employment as a supervisor where he prepared reports and completed schedules. The Staff Hearing Officer finds that the injured worker would be capable of performing entry level occupations which generally do not require high levels of writing or mathematics. The Staff Hearing Officer further finds that the injured worker's work experience did not provide him with transferable skills to other occupations. However, the injured worker demonstrated the ability to perform skilled employment wherein he supervised 25 to 30 people and maintained a position of employment for a period of 39 years. The Staff Hearing Officer finds that considering the injured worker's age, education, and work experience in conjunction with his ability to perform sedentary employment, he is capable of performing the occupations identified in the vocational report of Ms. Kaufman, such as: appointment clerk, scheduler, routing clerk, order clerk, information clerk, repair order clerk, and service clerk. Accordingly, the Staff Hearing Officer finds that [t]he injured worker is capable of engaging in sustained remunerative employment.
This order is based on the medical reports of Dr. Lutz and Dr. Brown and the vocational report of Ms. Kaufman.
 {¶ 25} 14. On February 9, 2005, relator, John W. Baker, filed this mandamus action.
Conclusions of Law:
 {¶ 26} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 27} Ohio Adm. Code 4121-3-34 sets forth the commission's rules applicable to the adjudication of PTD applications. Ohio Adm. Code4121-3-34(B) sets forth definitions. Ohio Adm. Code 4121-3-34(B)(2) sets forth the classification of physical demands of work. Thereunder, sedentary work, light work, medium work, heavy work, and very heavy work are defined. Ohio Adm. Code 4121-3-34(B)(2)(a) through (e).
 {¶ 28} Significantly, each of the five classifications of physical demands of work are primarily defined by the exertional force a claimant is able to produce in order to lift, carry, push, pull, or otherwise move objects.
 {¶ 29} For example, Ohio Adm. Code 4121-3-34(B)(2)(a) states:
(a) "Sedentary work" means exerting up to ten pounds of force occasionally (occasionally: activity or condition exists up to one-third of the time) and/or a negligible amount of force frequently (frequently: activity or condition exists from one-third to two-thirds of the time) to lift, carry, push, pull, or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.
 {¶ 30} Significantly, the definition of sedentary work fails to account for other than exertional force impairments. For example, the sedentary work definition does not account for impairments relating to fine manipulation with the upper extremity, nor does it account for grip strength impairment.
 {¶ 31} Accordingly, a person could conceivably be able to meet the exertional force requirements for the performance of sedentary work, yet have additional impairments that further limit the ability to perform a full range of sedentary work.
 {¶ 32} As described in his narrative report, Dr. Lutz found during his examination that relator has decreased sensation over much of the dorsum of the right hand. He is able to make only a partial fist, and has some loss of grip strength in the right dominant hand.
 {¶ 33} Using the AMA Guides, Dr. Lutz found that relator has an 18 percent right upper extremity impairment which translates to an 11 percent whole person impairment. Loss of grip strength impairs the right upper extremity by ten percent. Loss of range of motion impairs the upper extremity by six percent. Lack of ability to oppose the thumb to the fingers impairs the right upper extremity by four percent. There is also a two percent whole person impairment for ongoing pain to the right hand.
 {¶ 34} Clearly, placement of relator into the sedentary work classification, which is premised upon exertional force ability, fails to account for relator's significant right upper extremity impairment. This is not to say that it was improper for Dr. Lutz to indicate that relator can meet the exertional force requirements of sedentary work. However, it is clear that indicating relator's exertional force ability does not account for the impairments to the right upper extremity explained in the narrative report. In short, the narrative report must be read as stating impairments in addition to the exertional force limitation.
 {¶ 35} The Kaufman report strongly suggests that Kaufman only evaluated the sedentary exertional force limitations and thus failed to vocationally evaluate the 18 percent right upper extremity impairment.
 {¶ 36} Significantly, Kaufman wrote: "Dr. James Lutz; sedentary work" with no reference to the additional impairments contained in the narrative report. Moreover, there is no mention that relator has sustained other than exertional force impairments to his dominant right arm.
 {¶ 37} The commission relied upon the Kaufman report to support its nonmedical analysis. The commission specifically relied upon Kaufman's list of employment options. Because the Kaufman report is suspect as to whether Kaufman actually evaluated the impact of relator's significant right upper extremity impairments, as set forth only in Dr. Lutz's narrative report, the commission's nonmedical analysis must also be viewed as similarly flawed.
 {¶ 38} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its order denying relator's PTD application and, after elimination of the Kaufman vocational report from evidentiary consideration, issue a new order that adjudicates the PTD application in a manner consistent with this magistrate's decision.